Receipt number AUSFCC-8654504

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **SLSCO, LTD.**<br><br>   **Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES OF AMERICA**<br><br>   **Defendant.** | **No.** <u>  23-538 C  </u> |

## COMPLAINT

1.      SLSCO, Ltd. ("SLS") files this complaint challenging a Contracting Officer's Final Decision ("COFD") declining to overturn improper Contractor Performance Assessment Report ("CPAR") ratings. *See* Exhibit ("Ex.") 1, Feb. 16, 2023 COFD. The challenged CPAR ratings contain patent substantive and procedural errors that SLS has sought to remedy through the traditional claims process at the agency level. However, after a review of the claim submitted by SLS pursuant to the Contract Disputes Act ("CDA"), which detailed myriad problems with the disputed CPAR ratings, the U.S. Army Corps of Engineers ("USACE," or the "Agency") has decided to stand by its flawed ratings in the COFD issued on February 16, 2023. *See id.* The COFD upholding these ratings is arbitrary and capricious, and must be remedied in order to prevent further damage to SLS.

2.      On August 19, 2022, SLS submitted a claim pursuant to the Contract Disputes Act of 1978 and 41 U.S.C. §§ 7101-7109 and Federal Acquisition Regulation ("FAR") 52.233-1 (the "Claim") in connection with Contract No. W9126-G-19-C0006 (the "Contract"). *See* Ex. 2 ("CDA Claim").

3.      The Claim requested that USACE vacate and reassess the CPAR for SLS covering the 11/11/2019–09/20/2020 time period ("2020 CPAR") in connection with the Contract, which is

for the construction of a retaining wall on the border in Sector 02 of the Rio Grande Valley Management System ("RGV-02").

4.      In the 2020 CPAR, USACE determined—with no objective justification and without following the FAR's express requirements for conducting past performance reviews—that SLS's performance was "Marginal" or "Unsatisfactory" for the following evaluation areas: Quality; Schedule; Management; and Small Business Subcontracting. These assessments are not based on objective facts nor are they supported by program and contract data as expressly required by the FAR. *See* FAR 42.1503(b)(1).

5.      The assessment is also factually wrong in numerous areas—ignoring SLS's performance of, and compliance with, obligations under the Contract or incorrectly highlighting a dispute as a deficiency where USACE itself has presented conflicting direction and created obstacles that have hindered SLS's performance. Indeed, rather than being based on objective facts about performance and achievements of the actual goals of the underlying contract (which is to construct a section of the border wall on an accelerated time table), the evaluation appears based on subjective opinion, places blame on SLS for USACE's own errors, and does not even address SLS's achievement of actual contract objectives.

6.      For example, USACE has conceded that it caused significant schedule disruption under this and other border wall contracts due to its own failures to obtain real estate for the actual construction to commence under the Contract. Yet the 2020 CPAR makes no mention of these issues, instead criticizing SLS for USACE's own delays.

7.      The 2020 CPAR also suffers from fatal procedural flaws, including the evaluation being woefully late—thereby prejudicing SLS in its ability to defend against the CPAR in a timely manner—and involving USACE personnel ineligible to serve in those roles. The 2020 CPAR was

originally filled out by Gregory M. Schulz in late September of 2020. SLS timely submitted objections to this initial review early the following month. USACE then inexplicably waited 18 months to review and issue a modified 2020 CPAR, which it published on March 10, 2022. This length of time is inappropriate and an abuse of the CPAR process, especially given that this belated 2020 CPAR was finalized amidst SLS being considered for multiple high-value contracts by USACE and other agencies.

8.      This egregious length of time raises questions regarding the purpose of USACE's review and the personnel involved. Notably, since the 2020 CPAR was issued initially in 2020, the author of the report, Mr. Schulz, was no longer acting in any meaningful capacity on SLS's contract by the time the final CPAR was issued on March 10, 2022. In addition, a contracting officer overseeing the Contract, Eric Hurtado, no longer served in that role by the time that USACE finally issued the 2020 CPAR in March 2022, despite being listed as the Contracting Officer on the CPAR, making it unclear who was actually reviewing and finalizing the evaluation.

9.      This extended delay in finalizing the 2020 CPAR obviously means the evaluation ratings and comments do not reflect SLS's actual performance on the Contract, since 18 months had passed since the review period concluded, including an entire additional evaluation cycle, which was not reflected in the 2020 CPAR.

10.     The 2020 CPAR also did not receive an appropriate second level of review "at a level above the contracting officer" as required by law. FAR 42.1503(d). In response to the initial comments in the 2020 CPAR, SLS provided four pages of comments that responded to each point in the 2020 CPAR and explained why USACE's evaluation was factually and objectively incorrect. However, the "Reviewing Official" listed in the 2020 CPAR is completely improper, as

the official is Ms. Amelia Bryant, the contracting officer for the Contract at the time of publication (March 10, 2022).

11.     Needless to say, as the contracting officer responsible for SLS's Contract, Ms. Bryant is not "at a level above the contracting officer" (*id.*) and is therefore not eligible to provide a second level of review for the 2020 CPAR. Moreover, on information and belief, SLS has reason to believe based on conversations with USACE personnel that someone other than Ms. Bryant actually submitted the final review of the 2020 CPAR on the CPAR system, despite the system showing that Ms. Bryant signed and submitted the review of the 2020 CPAR.

12.     Assuming that Ms. Bryant did author the Reviewing Official comments for the 2020 CPAR—a point other USACE personnel have questioned—her status as the contracting officer for the Contract makes her ineligible to serve in this role. As discussed in more detailed below, USACE has taken the position that Ms. Bryant was eligible to submit this review based on an internal USACE policy statement purporting to allow a "procuring contracting officer" to act as the Reviewing Official for comments drafted by an "administrative contracting officer." This position is not supported by any regulation or law, particularly because the procuring contracting officer is viewed as the primary contracting officer for a contract—the administrative contracting officer cannot subsume this role for purposes of writing a CPAR. Moreover, USACE's position is flatly contradicted by the text of the FAR and the Federal Circuit's binding decision in *Bannum, Inc. v. United States*, 404 F.3d 1346, 1352 (Fed. Cir. 2005). Ms. Bryant reviewed this 2020 CPAR in her role as the contracting officer for the Contract, which is a violation of the law. To comply with the law, USACE should have assigned review responsibilities to personnel in Ms. Bryant's supervisory chain without direct connection to the Contract, so that a fair and impartial review could take place in accordance with *Bannum*.

4

13.     Ms. Bryant's review of the 2020 CPAR also raises serious questions. The original 2020 CPAR contained short explanations of the ratings, without documentary support or references and lacking in discussion of objective facts regarding SLS's contract performance. The comments from Ms. Bryant are much longer than the original comments, reference documents and information that were not included in the original 2020 CPAR, and address new facts and information that the original 2020 CPAR did not contain.

14.     This approach to a second level review of the CPAR is procedurally and objectively inappropriate, as it provides SLS with absolutely no opportunity to respond to the new allegations levied at SLS for the first time in comments from the "Reviewing Official."

15.     In addition, on information and belief, SLS has learned that Ms. Bryant was not in fact the author of the Reviewing Official's comments, despite submitting these comments under her name in the online CPARS database. This fact is clear from a review of Ms. Bryant's comments on a separate CPAR for the immediately adjacent contract for Sector 03 of the Rio Grande Valley Management System ("RGV-03"). The RGV-03 contract, which involved the substantially the same type of work and suffered substantially the same type of government caused delays as RGV-02, received similar negative reviews from the assessing official. However, Ms. Bryant's comments as the Reviewing Official for that CPAR strike an entirely different tone and rightfully recognize that USACE was at fault for the same issues that the 2020 CPAR inappropriately blames on SLS. Specifically, Ms. Bryant found that the reviews under RGV-03 would have to be reversed because of the USACE's fault in causing delays related to real estate acquisitions that greatly impacted the schedule under the RGV-03 contract. Considering Ms. Bryant's wholly different comments on an identical contract that she submitted one month later, the comments by the

"Reviewing Official" for the 2020 CPAR are deeply troubling and warrant a close review for impropriety and violations of procurement law and regulation.

16.     USACE's actions with respect to the 2020 CPAR are fundamentally unjustified and represent a perversion of the government's performance evaluation system that flaunts bedrock rules regarding how the government evaluates contractor performance. As explained below, the 2020 CPAR cannot stand because it is procedurally and substantively flawed, and the process leading to the 2020 CPAR deprived SLS of its right to a fair, objective higher-level review. Moreover, the CPAR is inaccurate—SLS's proven and well-recognized performance record requires it receive much better ratings than Unsatisfactory and Marginal across the evaluation areas. There is simply no reasonable basis for USACE's actions with respect to the 2020 CPAR, and there is a considerable question as to the propriety of the actions of the officials involved in actually drafting the 2020 CPAR.

17.     Nevertheless, in a Contracting Officer's Final Decision dated February 16, 2023, Contracting Officer Robin Prince ignored these myriad problems with the 2020 CPAR, and denied SLS's CDA claim on all ratings except Small Business Subcontracting, which the Contracting Officer agreed to reassess, but refused to vacate from the CPARs system. *See* Ex. 1. Based on these and other reasons set forth in this Complaint, SLS respectfully submits that USACE's actions were arbitrary, capricious, and contrary to law. *See* 28 U.S.C. § 1491(b)(4) (incorporating by reference 5 U.S.C. § 706).

## PARTIES

18.     Plaintiff SLS is a limited partnership organized under the laws of Texas with its principal offices located at 6702 Broadway, Galveston, TX 77550.

19.     Defendant is the United States of America, acting by and through USACE, an agency of the United States government. USACE issued the 2020 CPAR that SLS is disputing and

denied SLS's Claim on the same. The Contracting Officer currently responsible for the 2020 CPAR and the Claim is Robin G. Prince. The Assessing Official for the 2020 CPAR is Gregory Schulz and the Reviewing Official is Amelia Bryant, who was the Contracting Officer at the time of the 2020 CPAR being finalized in March 2022.

## JURISDICTION

20.     Jurisdiction is vested in this Court over this appeal of the Contracting Officer's denial of SLS's Claim in accordance with the Tucker Act, 28 U.S.C. § 1491(a), and the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109, which provides that, following an adverse decision by a contracting officer, "a contractor may bring an action directly on the claim in the United States Court of Federal Claims," 41 U.S.C. § 7104(b)(1).

21.     SLS exhausted administrative remedies by submitting a claim in writing to the Contracting Officer under 41 U.S.C. § 7103. *See* Ex. 2, CDA Claim.

22.     This action is timely brought within twelve months of February 16, 2023—the date on which the Contracting Officer issued a COFD denying SLS's Claim as to its Quality, Schedule, and Management ratings. *See* 41 U.S.C. § 7104(b)(3); Ex. 1, COFD. Specifically, the Contracting Officer denied all of SLS's Claim except for the small business rating, which the Contracting Officer agreed to reassess. SLS has confirmed that the Contracting Officer has no intention of changing any of the ratings in the CPAR except for the possibility of changing the small business rating.

23.     Plaintiff SLS has standing to sue under the Contract Disputes Act as a prime contractor in privity with the government. SLS has suffered concrete and particularized injuries that are fairly traceable to USACE's actions.

## FACTUAL BACKGROUND

**A.     The Border Wall Effort And SLS's Critical Work For USACE**

24.     The border between the United States and Mexico has drawn intense focus, both domestically and internationally, over the past few years for its prominent role in our nation's national security. While the majority of the 2,000-miles-long southern border is covered by the Rio Grande River, the 700 miles of land border requires some other form of defense. Since 2005, the United States has added an additional 500 miles of walling and fencing, all requiring the work of public and private entities.

25.     These hundreds of miles of walling and fencing require a constant and tremendous effort in order to ensure operational and national security. For example, the maintenance costs alone on California's section of the border fence were approximately $9 million for each year in the years preceding 2016. Along with maintaining the actual barriers, there are significant costs and efforts to maintain the associated roads, bridges, and lights along the fencing. Even still, individuals seeking to gain access create "human-sized holes" in these barriers around 550 times a year. The effort to maintain these vital structures requires consistent and harmonious working relationships between all the entities tasked with securing this border.

26.     And while the effort to maintain the southern border has been ongoing, recent events accelerated the standard timetables and pressed work to be completed more quickly than ever before. After entering the White House in 2017, President Trump continued his focus from the campaign on securing the border and expanding the associated barriers. However, years of inaction on the part of Congress hindered the President's efforts to expand the existing system.

27.     In response to this perceived inaction, President Trump issued a national emergency declaration in February 2019. The President declared that the "current situation at the southern border presents a border security and humanitarian crisis that threatens core national security

interests and constitutes a national emergency." The two operative sections of the declaration empowered the Secretary of Defense and Secretaries of related departments to order additional troop capacity at the southern border and to "take all appropriate actions, consistent with applicable law, to use or support the use of the authorities herein invoked." This declaration was the first of its kind and signaled just how vital enhanced border security, and the associated efforts to achieve it, was for this administration.

28.     The urgency was not lost on the Pentagon, which recognized that the President's national emergency declaration necessitated the waiver of a number of environmental laws for select segments of the border projects in order to meet the pressing deadlines. The April 2019 Department of Homeland Security ("DHS") Notice of Determination informed the public that 27 environmental laws would be waived for the Barrier Project, including the National Environmental Policy Act, the Endangered Species Act, the Federal Water Pollution Control Act, and the National Historic Preservation Act. The decision to waive these regulations greatly accelerated barrier project schedules because it removed the normally lengthy environmental reviews required under these waived laws.

29.     In the face of all of these external pressures, SLS has remained a stalwart and willing partner in ensuring mission success for these critical infrastructure projects, even in the face of danger and threats to safety. It is well known that work on the border barriers presents a number of unique risks. Bidders for and contractors on these projects consistently requested information for mitigation strategies against "hostile attacks." The government usually requires bidders to present security plans that detail strategic considerations such as "fall back positions" and "evacuation routines." These issues coupled with the death threats companies face for being tied to these politically charged situations show the significant cost that contractors endure to assist

in these projects. These costs and risks have only increased in the years since USACE elected to partially or completely terminate the border wall projects for the convenience of the government, based on policy decisions by the current administration. SLS has remained a trusted partner to help secure the nation's borders despite these well-documented risks and costs, and has worked with USACE to address termination requirements as contractually required.

**B.    Superior Performance by SLS on Rio Grande Valley District Contracts**

30.    Appreciating the context in which these border wall projects exist, SLS has performed admirably and earned positive remarks on its projects with the government, which makes the ratings in the 2020 CPAR unusual and an outlier.

**1.    Prior Favorable Ratings Under the Contract During 2018–2020**

31.    Under the Contract, SLS previously received favorable ratings for its performance. For the previous evaluation period, the Administrative Contracting Officer Mr. Schulz gave SLS satisfactory ratings for Quality, Schedule, Management, and Safety. Mr. Schulz's description and supporting reasoning for these ratings demonstrate how SLS performed well despite adverse conditions.

32.    Mr. Schulz noted SLS "worked with the Government to mitigate delay and overhead costs" because of disruptions to the job site and a "[s]uspension of [w]ork." These extraordinary efforts were rewarded with a "Very Good" rating for "Cost Control" under the contract.

33.    SLS, in its comments to the CPARS, reinforced the strong working relationship that the parties had. "We always do our best to work with our GOV partners to achieve equitable solutions to all project issues faced." And while the project was not yet complete at this point, SLS signaled that it had a strong belief that the government would work with SLS "in the same spirit" as the CPARS evaluation detailed above if they were to encounter any further delays.

## 2.      Recent Favorable Ratings Under An Identical Contract

34.      The CPAR that SLS received for nearly identical work on another RGV project makes the 2020 CPAR even less understandable. On April 26, 2022, SLS received an updated CPAR on the RGV-03 project. This new CPAR covered almost the exact time period as the RGV-02 project, with RGV-03 encompassing October 31, 2019, through September 20, 2020.

35.      SLS's work on the RGV-03 project almost entirely mirrors the structure of the RGV-02 project. Both projects are located in Hidalgo County, TX. Both projects are "for the design and construction of a reinforced, concrete retaining wall with 18 foot tall bollards on the levee that is part of the International Boundary Water Commissions (IBWC) Rio Grande Valley Flood Risk Management System." Both projects require that SLS "shall provide all labor, material, supplies, tools, equipment, transportation, quality control, project management and related services to complete the contract as specified in the Government's plans and specifications for this project and also in accordance with the Contractor's accepted design and technical approach." Both projects are based in the RGV region, with nearly identical specifications and requirements. Each project has faced the same real estate challenges and were being executed simultaneously.

36.      Even stronger evidence of the odd discrepancy between the ratings for the two projects lies in the Reviewing Official listed on each CPAR. Amelia Bryant is the Reviewing Official for the RGV-03 CPAR as well as on the 2020 CPAR for RGV-02.

37.      Despite similar requirements and similar performance by SLS, Ms. Bryant's conclusions regarding RGV-02 and RGV-03 are diametrically opposed and simply do not make sense. For RGV-03, Ms. Bryant rated SLS as follows: Satisfactory for Quality, Schedule, Management, and Safety, with just one Unsatisfactory for Small Business Contracting. These ratings are in stark difference to the RGV-02 ratings.

38.     Ms. Bryant's comments in the CPAR also demonstrate a very different approach

than her purported RGV-02 comments. Unlike in RGV-02, here Ms. Bryant reasonably understood

in assessing the Schedule factor that SLS could not be at fault for schedule issues because it was

in fact the government's delay that caused these issues:

> The contractor states that the Government did not release the
> entirety of Segment 5 for construction and during research the RO
> found this to be true. Segments RGV-MCS-2119 Cavazos and
> RGV-MCS-2126-1 are not released at the writing of this review.
> The tract 2126-1 is now owned by the Government, but 2119 has
> not been acquired. The two tracts run parallel and one cannot be
> released without the other. Considering that the entirety of any
> segment was not released for construction the RO finds that the
> contractor should not be held to specific measures of schedule.
> While the ability to achieve significant rates is concerning, the RO
> does not find it reasonable to hold the contractor to schedule.
> Further, the contractor states that there was an issue with the United
> Irrigation District (UID) of Hidalgo County. The AO did not
> mention this fact. The UID issue revolved around two 50-foot
> easements and an irrigation line that traversed through Segment 5.
> The UID sent the contractor a cease & desist letter on 24 February
> 2020. The Government did not resolve this issue and obtain the
> required out-grants from the UID until 14 February 2021. **The RO
> finds that it is unreasonable to hold the contractor to contractual
> Period of Performance requirements considering that the
> Government did not adequately release segments to the
> contractor and did not properly understand the UID easements
> in the area prior to releasing the segments for construction.**

Ms. Bryant recognized that SLS's "performance in these areas is difficult to judge when the

Government did not fully provide these areas or execute modifications in time to allow the

contractor to mobilize to these areas (Section 1-3) within the rating period." These issues were not

merely due to a lack of real estate being made available by the government, but also due to the

sequencing and piece-meal approach to releasing real estate for the project over time, which made

scheduling and preparations extremely difficult for SLS as this approach was not contemplated in

the Contract at all.

39.     Given that SLS had to deal with these "largely unknown real estate concerns," Ms. Bryant found that upgrading SLS from unsatisfactory to satisfactory was more than justified. Importantly, these real estate issues—for which Ms. Bryant found USACE to be at fault in RGV-03—were just as present for RGV-02. Yet Ms. Bryant inexplicably came to a completely different conclusion for RGV-02.

40.     On Management, Ms. Bryant also reasonably assessed that the AO's logic was flawed in that he believed that SLS's "manpower and production rates needed to be scrutinized to determine the rating for management." But given the government's fault in the scheduling issues and the AO's lack of evidence, Ms. Bryant upgraded this rating from unsatisfactory to satisfactory. And Ms. Bryant also found that the AO's claimed evidence for the Marginal rating of "several negative instances within the last 30-45 days of the report being issued" had no merit and so she upgraded SLS to Satisfactory.

41.     Unlike with RGV-02, Ms. Bryant provided an overall positive review and even concluded that she "would recommend [SLS] for similar requirements in the future." It is difficult to square Ms. Bryant's conclusions regarding RGV-03 with her unfounded and incorrect criticisms for RGV-02, unless (as discussed above and based on information and belief) it is in fact the case that Ms. Bryant did not actually author the Reviewing Official comments for the 2020 CPAR for RGV-02.

### 3.     Favorable Ratings For Other Border Wall Work

42.     Beyond the two RGV contracts, SLS also worked with USACE in San Diego on a project to replace "existing fence material with new 18, 25, and 30 feet bollard wall panels" just a few feet from the international border with Mexico. The contract also required that SLS install all the necessary, ancillary components to ensure a safe and effective job site, which included concrete roads, retaining walls, and low water crossings. As is standard practice for these types of jobs, SLS

worked with a subcontractor, Gibraltar U.S. Inc., and managed its efforts in constructing concrete foundations, fabricating wall panels, and installing wall panels beyond SLS's portion of the work.

43.     Despite the associated difficulties with managing efforts at the southern border, SLS was recognized for its "perseverance" with "Very Good" ratings in Quality, Schedule, Management, Small Business Subcontracting, and Design. USACE noted specifically that despite the construction tasks themselves being "relatively simple in nature," "the work location, terrain, and other unique constraints presented considerable construction challenges." SLS also worked to ensure that a "religious shrine just a few inches away from the fence" installation sites was avoided and kept safe throughout the process, further supporting the "Very Good" Quality rating. And again, despite these challenges, SLS and its efforts still warranted high marks.

44.     USACE gave special remarks to the relationship that SLS developed and maintained with the government to ensure project success. SLS "made considerable efforts to work very closely with USACE QA personnel to ensure construction of all of these features of work exceeded expectations." SLS also helped to ensure its subcontractors maintained this level of professionalism, earning the following accolades from USACE:

> As the Prime Contractor, SLS demonstrates exceptional transparency and communication regarding their dealings with Subcontractors and their specific involvement and roles on the project. They keep Subcontractors involved and informed, even frequently recognizing them for positive performance in front of the client and other public settings. This creates a very positive team environment with Subcontractors, along with SLS employees, feeling as if they are equal members of a successful team and mission.

45.     Along with the focused management of subcontractors, SLS worked diligently to (and succeeded in) creating a safe work environment for all parties involved. SLS responded swiftly to initial safety mishaps, prompting USACE to note that "there were no significant repetitive mishaps" because SLS's "Safety staff would review incidents and implement changes

to prevent recurrence." While some issues cannot be avoided, SLS works to ensure that these unforeseen problems do not recur.

46.     This job, along with every other SLS has participated in, demonstrates how much SLS values and works to maintain positive working relationships with its government partners.

**C.     SLS's Performance On The Contract**

47.     As with all its previous contracts with the government, SLS has performed exceptionally well given the expedited timeframe, haphazard real estate release schedule, and complex project site that included operating on miles of existing earthen levee that was adjacent to multiple active farming operations.

48.     SLS was on pace to complete the levee barrier by the end of 2022, consistent with USACE program goals, and committed to USACE in doing the same. And, thus far, SLS has not received any serious deficiencies regarding the quality of border fence construction work in place.

49.     As of today, SLS has completed 5.41 miles of the bollard barrier that the Contract required, meaning that SLS has finished 69% of the original Contract's objectives. *See* Ex. 5, C. Lowe Declaration ¶ 4. And as a result of broader national policies, USACE exercised a partial termination for convenience of the Contract such that SLS's finished work now represents a 99% completion rate for the altered Contract objectives. *See id.*

50.     SLS was able to achieve these completion figures despite USACE engaging in a haphazard notice to proceed ("NTP") process that was inconsistent with the contract and created a number of construction, timing, and logistical issues.

51.     The Contract's NTP schedule specified the sequencing and dates for the release of all sections of work, which included two Base sections and three Option sections. Each section of the work had its own "NTP for Construction on or about" date that had been agreed upon by the parties when the Contract was executed. Despite the fact that USACE clearly defined the NTP

schedule during the solicitation phase, included it prominently in the Contract, and approved SLS's baseline schedule that incorporated these agreed-upon NTP dates, USACE chose (over SLS's objections) to unilaterally deviate from the NTP schedule without modifying the Contract. USACE's unilateral decision to deviate from the original NTP schedule is the root cause of the myriad problems that USACE has identified as SLS's own fault.

52.     In order to clearly show these real estate delays and associated scheduling issues, SLS has prepared the attached Exhibit 3, which is a chart that details all of the NTP issues that plagued this Contract. As the chart shows, SLS received its initial NTP on the design phase for most of the sections of the Contract on December 28, 2018. *Id.* But USACE then proceeded to authorize the construction portions for the Base and Option tracts of land in a piecemeal fashion inconsistent with the terms of the Contract over the next 18 months. *Id.* While the Contract called for Base 1 to be released first, followed by Base 2, Option 1, Option 2, and Option 3 in that order, USACE instead released all sections of the work—including the underlying tracts of land—out of temporal and geographical sequence.

53.     For instance, the NTP schedule in the Contract specifies that Base 1 will be the first section of work released, and that USACE will release this section five months prior to the release of any other section of work. Since Base 1 is the shortest and technically simplest section of work to execute (calling for SLS to install only 559 panels over a 240-day period of performance), SLS bid the project with a gradual "ramp up" of production rates in its baseline schedule that would account for the first five months being slower. This is a common approach in construction planning that allows project managers and crews time to become familiar with the terrain and to ensure proper processes are in place and working prior to more complicated and demanding sections of projects opening up. Therefore, SLS's entire as-bid construction plan relied upon this five-month

period of gradual construction to serve as a primer for the project prior to the release of the remaining sections, which were set to ramp up simultaneously, thus requiring much faster production and more difficult coordination challenges.

54.     Although USACE approved of this NTP schedule and incorporated it into the Contract, the agency failed to comply with it. Instead of releasing Base 1 as the first section of work, it was actually released as *the third section* of work *eight months* after the first section was released, and *a full year* after the release date specified in the contract for Base 1.

55.     Contrary to the agreed-upon NTP schedule, the first section USACE actually released for construction was Base 2, which required considerably more work to be performed in the same time allowed for Base 1 (1,295 panels vs. 559 panels) and the type of construction was significantly more challenging (12' high reinforced concrete floods walls vs. simply 6' trench footers). Base 2 included 8 tracts of land that SLS originally planned to construct in a geographically sequential order (going from tract RGV-WSL-6000 to -6007). However, USACE initially issued a Limited NTP ("LNTP") for only the second and third tracts of land—which could only be accessed via the *first* tract of land, released 11 days later. Because USACE had prohibited SLS from privately negotiating leases or easements with the relevant landowners for access to the necessary real estate, SLS could only wait for USACE to procure it and provide SLS access.

56.     Over the next five months, USACE randomly released the remaining five tracts of land without any advance notice, and again out of sequence from what was planned in the contract's baseline schedule. *Id.* Perversely, the agency also expected SLS to stick to the estimated production rate goal for this section, despite the fact that, in releasing this section first, SLS had been denied the five-month period to scale up its operations as contemplated in the original construction plan and the NTP. In other words, the agency expected SLS to go from zero to 60

with little notice, and without the ramp-up period contemplated by the NTP. This expectation ignored business realities—including labor and supply market challenges at the height of the COVID-19 pandemic—as well as the agreed-upon schedule incorporated into the Contract.

57.     Because of the government's delays in releasing real estate, SLS was never able to proceed with construction on this project in a logical manner consistent with the sequence outlined in the Contract or as SLS had planned in the baseline schedule included with its proposal. Nevertheless, SLS was still able to perform admirably and complete nearly all of the contracted work that USACE made available.

58.     USACE demonstrated its satisfaction with the quality of SLS's work on the project—and SLS's ability to meet required specifications by USACE standards—by regularly paying for completed elements of the project.

59.     By October 2020, USACE had paid SLS over $74 million for its work without withholding any retainage. If there were major concerns regarding the quality of SLS's work (as implied by the 2020 CPAR), then USACE would have reflected that in its payment decisions to SLS. Instead, USACE's payments demonstrate an acceptance of SLS's construction work as meeting contract quality and specification requirements.

60.     SLS, like the Government, appreciates that the very nature of this type of project can lead to challenges. SLS has remained committed to this project throughout and worked to help alleviate all issues within its control to ensure smooth, timely work.

**D.     USACE's Procedural Failures: Delayed Notification Of Marginal Ratings By Official Without Knowledge Of SLS's Performance**

61.     No reasonable contractor would have expected the 2020 CPAR to be finalized by the Reviewing Official as it currently stands given the circumstances and performance discussed above. SLS first received a draft copy of the original version of the 2020 CPAR on June 20, 2020,

from Gregory Schulz, who then met with Cliff Lowe and other SLS colleagues on June 23, 2020, to discuss the contents of the comments and ways that SLS could improve its performance in order to improve the ratings prior to being officially submitted into the CPAR system. *See* Ex. 5 ¶ 5. But to SLS's surprise, USACE finalized the 2020 CPAR in March 2022 despite myriad and obvious procedural failures that render the 2020 CPAR invalid.

62.     As an initial matter, the 2020 CPAR was incredibly delayed. Although the 2020 CPAR was initially issued in October 2020 by Gregory Schulz and SLS submitted its comments that same month, 18 months passed without any formal response or processing until USACE finally submitted the modified 2020 CPAR on March 10, 2022.

63.     Once SLS reviewed the modified 2020 CPAR, it was surprised to find that the listed Reviewing Official who had written all these "revised" comments was Amelia Bryant. This did not seem appropriate given that Ms. Bryant was the Contracting Officer for this project at the time she submitted the 2020 CPAR.

64.     Moreover, the 2020 CPAR confusingly lists the date of Mr. Schulz's assessing official signature as March 10, 2022, despite the fact that Mr. Nathan Cooper appeared at an official weekly meeting for this contract on March 1, 2022 and stated that he was the new Administrative Contracting Officer, replacing Mr. Schulz. SLS received an email shortly thereafter, on March 3, 2022, indicating that Mr. Schultz was leaving. SLS has reason to believe, by Mr. Cooper's own admission, that it may have been Mr. Cooper, and not Mr. Schulz, who finalized the Assessing Official comments on the 2020 CPAR, despite the fact that his name appears nowhere on the document.

65.    The 2020 CPAR also listed Mr. Eric Hurtado as the Contracting Officer despite Mr. Hurtado having left the USACE Fort Worth District and was no longer serving as the Contracting Officer on this Contract in March 2022.

66.    SLS reviewed official correspondence and confirmed that Ms. Bryant was identified as the Contracting Officer by at least May 2020, well before Mr. Hurtado purportedly acted as the official Contracting Officer on the 2020 CPAR in March 2022, nearly two years later. *See* Ex. 5 ⁋ 13.

67.    Most shocking of all was what SLS discovered in further conversations with USACE personnel over the last 18 months: Ms. Bryant was, on information and belief, not in fact the official who even drafted these disputed "revised" comments. *See id.* ¶ 15.

68.    According to discussions that Mr. Cliff Lowe (SLS Project Executive) had with Mr. Schulz (the Assessing Official), Mr. Ryan Sands (USACE Contracting Chief), Mr. Nathan Cooper (Administrative Contracting Officer), and Ms. Bryant, it is SLS's understanding, based on information and belief, that the Reviewing Official comments were drafted by Eric Hurtado, not Ms. Bryant, and that she simply reviewed and submitted them as her own. *See id.* ¶¶ 15-17. SLS contends this would explain the distinctly different Reviewing Official comments submitted under Ms. Bryant's name for the nearly identical RGV-02 and RGV-03 projects, for which the government had the same difficulties procuring real estate necessary for construction.

69.    Mr. Schulz stated that he did not know why the 2020 CPAR was not submitted in a timely manner. *Id.* ¶ 17. He also stated that Mr. Hurtado was replaced by Ms. Bryant as the Reviewing Official, and that Ms. Bryant submitted the CPARS "in response to pressure from USACE leadership to clean up administrative issues to include delinquent CPAR evaluations that USACE had not acted upon." *Id.* ¶ 18; *see also id.* ¶¶ 15-17.

### E. USACE's Substantive Failures To Accurately Review SLS's Performance Or Consider SLS's Disagreements During The Second Level Review

70. Beyond the myriad procedural failures described above, the 2020 CPAR failed to accurately describe SLS's performance on the Contract on three separate issues: the timeline and responsibility for the acquisition of necessary Contract real estate; the Contract's requirements to build a retaining wall versus a levee wall; and SLS's actual use of small business subcontractors.

#### 1. USACE Delayed Acquisition of Key Real Estate and Associated Materials Delay

71. The 2020 CPAR primarily downgrades SLS on the "Schedule" and "Management" factors because SLS allegedly failed to achieve the anticipated "production rate" for the erection of the first 60 wall panels over just 485 feet. These schedule problems resulted directly from USACE's decision to proceed with the start of work on the Contract without having fully obtained commitments for all the necessary real estate, which the government knew at the time of award would make the contractual Notice to Proceed dates impossible for USACE to achieve.

72. USACE's haphazard process for releasing the various tracts of real estate needed for construction also created systemic problems for SLS's ability to proceed with the construction plans it outlined in its proposal, which formed the basis of award and which USACE accepted as part of the baseline project schedule. Namely, SLS was never able to construct the project consistent with the sequence and timelines specified in the Contract and baseline schedule for which SLS planned to deploy a much larger workforce spaced over the various sections moving sequentially from panel to panel in an assembly-line like fashion. Instead, after a nine-month government delay at the height of the COVID-19 pandemic, SLS was forced to mobilize fewer and smaller crews in a random order to perform piecemeal work as non-contiguous sections of real estate were made available without advance notice.

73.     And when USACE finally released all of the real estate to SLS, USACE released *all* sections of the work within just 100 days. This approach deviated from the agreed-upon schedule in the Contract and required SLS to rapidly begin panel installation at a rate many times faster than required by the Contract. By denying SLS access to the real estate in accordance with the NTP schedule that was agreed upon in the Contract, USACE removed SLS's ability to leverage the methodical, force-multiplier construction strategy it planned to use in the approved baseline schedule and made it impossible for SLS to achieve targeted production goals.

74.     The 2020 CPAR fails to describe or acknowledge these facts. And now SLS is paying the price with negative CPAR ratings for decisions that USACE made and knew full well would cause the exact issues for which it now downgrades SLS.

75.     In particular, it is an uncontroverted fact that USACE failed under RGV-02 to timely release the necessary real estate on which the contract was to be constructed. The Contract originally called for construction to begin in April 2019, but the Government did not issue the first construction NTP until August 2019, but as noted above, it was only an LNTP for a small portion of a larger section of land.

76.     USACE acknowledges some of these issues in its August 19, 2019 Limited Notice to Proceed. On behalf of USACE, Mr. Gregory Schulz directs that the work under the Contract for a small portion of Base 2 could proceed but "[w]ork in remainder of Base 1 and 2 will continue to be suspended until completion of the Government's real estate actions."

77.     He then provides an update that the availability of a portion of the additional real estate "is anticipated" later in August 2019, but that real estate acquisition is still not a certainty months into the project. And Mr. Schulz concludes by admitting further that SLS cannot provide a "total impacted schedule" to USACE until USACE solves "the entire real estate availability

issue." The Government's admitted lack of certainty around the real estate availability issue, which had already delayed the start of construction by five months, forced SLS and its subcontractors to attempt to determine a reasonable allocation of resources against entirely uncertain timelines. Given that SLS and the subcontractors had no way to know when they would actually be able to begin the work in earnest, it was a reasonable business decision for SLS and the subcontractors to refrain from fully staffing the project sites until the Government committed to a date certain, and to expect that—even if delayed—the Government would stick to the schedule sequencing agreed to by the parties in the Contract. It was unreasonable for the government to instead fundamentally alter the schedule, eliminate key ramp-up periods, and expect SLS to instantly begin full rate construction at a moment's notice.

78.     The government itself has conceded that the Contract schedule was no longer viable when it issued a modification in November 2020 extending the contractual period of performance by approximately 180 days, to May 2021. But the government only did so after the Assessing Official's comments on the 2020 CPAR were submitted—and thus it is unclear to what extent the 2020 CPAR itself takes the schedule modification into account.

79.     SLS did not cause these real estate availability issues; USACE caused them when it knowingly drafted the Contract parameters to include unrealistic and uncertain real estate acquisition dates. Indeed, it took USACE more than a year after the construction was supposed to start before it actually released the majority of the real estate segments for RGV-02. In fact, USACE's decision to proceed with a horizontal construction contract without first obtaining all of the required real estate went against long-standing policy and accepted best practices of both USACE and the government at large. USACE's approach to these real estate issues—proceeding at-risk with a construction contract without first obtaining all real estate needed—placed the border

wall program at great risk of failure and exposed the government to increased liabilities, none of which was the fault of SLS.

80.     As described above in Section I.B.2, the RGV-03 2020 CPAR (another border barrier CPAR) addresses nearly identical requirements and challenges, yet SLS received positive ratings for its work on that contract. Most troubling, the real estate issues that plagued the government's efforts in RGV-02 (for which the government is seeking to blame SLS) are addressed in the RGV-03 2020 CPAR and explained as obvious government failings for which SLS cannot be held accountable.

81.     The RGV3 2020 CPAR recognizes that "the Government did not . . . execute modifications in time to allow the contractor to mobilize" once real estate was released, and that "the contractor could not be expected to provide a reasonable schedule based upon [] largely unknown real estate concerns."

82.     As a result of these real estate delays, SLS was forced to start construction in early 2020 at the height of the COVID-19 pandemic and encountered difficulties in securing labor and materials on an indeterminate timetable, for which the 2020 CPAR fails to account. The 2020 CPAR also does not describe the Suspension of Work letter issued on April 20, 2019, which prohibited SLS from purchasing "long lead" materials without USACE approval 30 days prior to the "order date" of the materials, which could never be established because of the government's real estate delays. This, combined with the government's refusal to provide an accurate forecast for the release of the delayed real estate, significantly impeded SLS's ability to mobilize quickly once real estate was in fact acquired and released. Ex. 2 at 2-3.

83.     In sum, USACE has blithely ignored these fundamental changes to the agreed upon construction sequencing schedule, for which USACE is at fault, and has attempted to blame SLS

for USACE's own schedule and management issues tied to these very problems. At best, it is blatantly unfair for USACE to punish SLS with negative CPAR ratings for its own transgressions; at worst it suggests malice.

### 2.   Contract Requirements for Retaining v. Levee Wall

84.   The 2020 CPAR improperly downgrades SLS on the "Quality" and "Management" factors in relation to delay and complications in constructing a "levee wall." While the original solicitation for the contract called for the construction of a "levee wall," Amendment 0002 to the solicitation deleted the reference to "levee wall," and replaced that term with "retaining wall."

85.   In accordance with the awarded contract terms, SLS was required to construct a "retaining wall" to required specifications. However, the government constructively changed the contract without modification during the design review process by requiring the designer of record to include construction notes that required construction of a "levee wall" instead of a "retaining wall," which necessitated changes to SLS's construction methods that extended the duration of performance.

86.   The distinction between a "retaining wall" and a "levee wall" is important because it greatly changes the types of construction activities a contractor would have to engage in for successful contract completion. Unlike a "retaining wall," a "levee wall" requires more restrictive backfill requirements that are more time-intensive to perform.

87.   The "retaining wall" requirements under Texas Department of Transportation ("TXDOT") specifications only require "horizontal lifts no greater than 8 inches and compacted by mechanical means only to at least 95%." Whereas the "levee wall" requires "fill materials shall be placed in 6" loose/4" compacted lifts." The stricter requirements for a "levee wall" doubles the quantity of horizontal lifts necessary to achieve the same vertical height, since the width of each

allowable lift is halved (from 8 inches to 4 inches). This greatly affected SLS's as-planned/as-bid means and methods and production rates by as much as 35%.

### 3.   The Small Business Utilization Rating is a Product of SLS's Attempt to Exceed Small Business Subcontracting Requirements

88.   The 2020 CPAR improperly downgrades SLS on the "Small Business" factor with an "Unsatisfactory" rating because, according to USACE, SLS failed to meet its Small Business subcontracting goals. This rating is based on two primary issues. The first is that SLS submitted Individual Subcontracting Reports late, a discrepancy that SLS immediately corrected.

89.   Second, and the predominant reason for the "Unsatisfactory" rating, is that SLS, in good faith, set admirably high goals in its small business subcontracting plans for the RGV-02 contract, greatly exceeding the solicitation's requirements.

90.   However, SLS only believed that it would be able to achieve these high goals due to an honest mistake. SLS accepted a verbal confirmation from a critical subcontractor, a local family-owned business with only two offices, that they were in fact a small business and was unable to verify the claim itself through SAM.gov (System for Award Management) because the subcontractor did not have a current certification on file.

91.   As a result, SLS mistakenly submitted a Small Business Subcontracting Plan that reflected a small business subcontracting goal of 83%, far exceeding the government's own solicitation goal of only 25%. SLS later determined that due to annual revenues, the subcontractor that verbally confirmed as a small business was in fact considered a large business under Small Business Administration ("SBA") standards.

92.   Upon realizing this mistake, SLS sought relief from the Contracting Officer to reduce its errantly high small subcontracting goal to align with the solicitation goal. SLS correctly pointed out that the evaluation criteria in the Solicitation did not provide any special considerations

for Small Business Plans that exceeded solicitation goals. The Solicitation rated Small Business Plans as simply "Acceptable," if the government's 25% goal was met, or "Unacceptable" if not met. SLS's Small Business Subcontracting Plan with a small business subcontracting goal of 83% did not gain any special consideration since any percentage equal to, or greater than, the government's 25% goal was considered satisfactory for making an award determination.

93.   Despite this fact, and despite the fact USACE had inadvertently never submitted the SLS Small Business Subcontracting Plan in question to the SBA to officially register the requirement, the Contracting Officer refused to provide the requested relief and instead submitted the plan to the SBA anyway, even after SLS informed USACE of its inherent flaws. And even though the FAR expressly prohibits the government from taking negative action against a contractor that, in good faith, relied on "misrepresentations made by its subcontractors" regarding size, here USACE inappropriately assessed SLS with a negative CPAR rating for precisely this type of reliance.

94.   Because of the errantly high small business subcontracting goal (83%) it was practically impossible for SLS to ever recover, since the subcontractor in question was a key team member already under contract for a significant portion of work and thus virtually impossible to replace. In another attempt to seek fair relief from an honest mistake, SLS has recently submitted a Revised Small Business Plan that better aligns with current contract conditions. Specifically, as this project evolved (or *de*volved) through multiple suspensions of work, de-scope actions, and partial terminations for convenience, the Small Business Subcontracting Plan necessarily required updating and adjustment. SLS is currently awaiting approval of this revised subcontracting plan by the Contracting Officer.

95.   The CPAR misleadingly does not reflect this additional context.

### F.      THE CPAR EVALUATION PROCESS

96.      The FAR mandates that agencies use the CPAR System to evaluate contractors'

actions under certain previously awarded contracts. *See* FAR 42.1502(a). As the Inspector General

for the U.S. Department of Defense (DoD IG) has stated, "[t]he primary purpose of CPARS is to

ensure that current, complete, and accurate information on contractor performance is available for

use in procurement source selections." With that purpose in mind, the 2022 CPARS Guidance

Manual states:

> In order to have useful information available the next time an award
> is imminent, it is of the utmost importance that the AO submits a
> rating consistent with the definitions of each rating and thoroughly
> describes the circumstances surrounding a rating. The definitions of
> each rating, together with related guidance for preparing the
> narrative, are provided in the Evaluation Ratings Definitions found
> in FAR 42.1503(h)(4). Each factor used shall be evaluated and a
> supporting narrative provided (FAR 42.1503(b)(4). **Each
> evaluation must be based on objective data (or measurable,
> subjective data when objective data are not available)
> supportable by program and contract/order management
> records.**

Guidance for the Contractor Performance Assessment Reporting System (CPARS), Apr. 2022

("CPARS Guidance Manual") at 7 (emphasis added).[1]

97.      The FAR states that the past performance evaluations should include "clear relevant

information that accurately depicts the contractor's performance, and be based on objective facts

supported by program and contract or order performance data." FAR 42.1503(b)(1). Additionally,

the evaluations "should be tailored to the contract type, size, content, and complexity of the

contractual requirements." *Id.*

---

[1]  Available at https://www.cpars.gov/documents/CPARS-Guidance.pdf.

98.     As a matter of law, the evaluation must cover: (1) Technical (quality of product or service), (2) Cost Control, (3) Schedule/Timeliness, and (4) Management or Business Relations. *See* FAR 42.1503(b)(2). The agency is to evaluate contractor performance using a five-tier scale: Exceptional, Very Good, Satisfactory, Marginal, and Unsatisfactory. FAR 42.1503(b)(4). The FAR provides the following definitions of those terms:

a.  "**Exceptional**" includes performance that "meets contractual requirements and exceeds many to the Government's benefit. The contractual performance of the element or sub-element being evaluated was accomplished with few minor problems for which corrective actions taken by the contractor were highly effective." FAR 42.1503 Table 42-1. For the Exceptional rating to apply, the reviewing agency must "identify multiple significant events and state how they were of benefit to the Government. . . . Also, there should have been NO significant weaknesses identified." *Id.*

b.  "**Very Good**" describes performance that "meets contractual requirements and exceeds some to the Government's benefit. The contractual performance of the element or sub-element being evaluated was accomplished with some minor problems for which corrective actions taken by the contractor were effective." *Id.* For the Very Good rating to apply, the reviewing agency must "identify a significant event and state how it was a benefit to the Government. There should have been no significant weaknesses identified." *Id.*

c.  "**Satisfactory**" is defined as performance that "meets contractual requirements. The contractual performance of the element or sub-element contains some minor problems for which corrective actions taken by the contractor appear or were

satisfactory." *Id.* For the Satisfactory rating to apply, "there should have been only minor problems, or major problems the contractor recovered from without impact to the contract/order. There should have been NO significant weaknesses identified." *Id.* The regulations also state that "[a] fundamental principle of assigning ratings is that contractors will not be evaluated with a rating lower than Satisfactory solely for not performing beyond the requirements of the contract/order." *Id.*

d. "**Marginal**" applies to performance that "does not meet some contractual requirements. The contractual performance of the element or sub-element being evaluated reflects a serious problem for which the contractor has not yet identified corrective actions. The contractor's proposed actions appear only marginally effective or were not fully implemented." *Id.* For the Marginal rating to apply, the government agency must "identify a significant event . . . that the contractor had trouble overcoming and state how it impacted the Government. A Marginal rating should be supported by referencing the management tool that notified the contractor of the contractual deficiency (e.g., management, quality, safety, or environmental deficiency report or letter)." *Id.*

e. "**Unsatisfactory**" applies to performance that "does not meet most contractual requirements and recovery is not likely in a timely manner" and that reflects "a serious problem(s) for which the contractor's corrective actions appear or were ineffective." *Id.*

99.     Additionally, the reviewing agency may use plus or minus signs to indicate an improving or worsening trend that is otherwise insufficient to change the evaluation status. *See id.* n.1.

100.    Each reviewing agency must prepare the evaluation "at the time the work under a contract or order is completed," FAR 42.1502(a), and the evaluation must be "provided to the contractor as soon as practicable after completion of the evaluation." FAR 42.1503(d). Once the contractor receives the CPAR, it has fourteen days to submit comments, rebut statements, or provide additional information. *See id.* The reviewing agency (at a level above the contracting officer) must then review the comments and resolve disagreements. *See also id.*

101.    If there is still a disagreement about the disputed CPAR, the contractor may submit a certified claim requesting relief to the contracting officer. *Vanquish Worldwide, LLC v. United States*, 134 Fed. Cl. 72, 76–77 (2017). If the reviewing agency denies the request in the certified claim, the contractor may then appeal the decision. *MicroTechnologies, LLC*, ASBCA Nos. 59911, 59912, 16-1 BCA ¶ 36,354 ("[T]he Board possesses jurisdiction to consider [the contractor]'s challenges to its CPAR evaluation. It is an appeal from the denial of claims 'relating to the contract.'" (quoting FAR 2.101) (citing *ToddConstr., L.P. v. United States*, 656 F.3d 1306, 1312–15 (Fed. Cir. 2011)).

## CLAIMS ASSERTED

102.    SLS respectfully submits that USACE failed to comply with governing law and procedures in assigning personnel to review SLS's performance, as well as in the analysis of SLS's performance in the 2020 CPAR. USACE also failed to comply with its implied contractual duty of good faith and fair dealing and the implied contractual duty to cooperate when rendering this CPAR evaluation. *See Cameron Bell Corp. d/b/a Gov Sols. Grp.*, ASBCA No. 61856, 19-1 BCA ¶ 37,323 (citing *Versar, Inc.*, ASBCA No. 56857, 10-1 BCA ¶ 34437 at 169,959).

103.    The Court of Federal Claims has described that the duty of good faith and fair dealing requires "[g]ood faith performance" that "emphasizes . . . consistency with the justified expectations of the other party." *Mansoor Int'l Dev. Servs., Inc. v. United States*, 121 Fed. Cl. 1, 7 (2015) (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)). Accordingly, SLS justifiably expected USACE to assign personnel with knowledge of SLS's performance to review SLS, assign a qualified second level reviewer at a level above the contracting officer to make a good faith assessment of the disagreements between the parties, and make a good faith effort to accurately apply the CPAR performance standards as outlined in the FAR in a timely manner.

104.    SLS submits that USACE's evaluation of SLS in the 2020 CPAR is at a minimum arbitrary and capricious, and that the procedural impropriety regarding the Assessing and Reviewing Officials raises serious questions regarding whether SLS received fair treatment under the 2020 CPAR at all. Because of these errors, as presented below, the Court should declare the 2020 CPAR and USACE's process for completing the CPAR to be improper, arbitrary, capricious, and contrary to the FAR, and require that USACE reassess SLS's performance in accordance with the Court's directions.

A.      **USACE Failed To Follow Required Procedures For Issuing And Responding To A CPAR Assessment**

1.      **USACE Failed To Review SLS's Response To The 2020 CPAR At The Required Level Above The Contracting Officer**

105.    USACE failed to provide SLS with the required review of SLS's responses to the 2020 CPAR. The FAR requires agencies to "provide for review at a level above the contracting officer to consider disagreements between the parties regarding the evaluation." FAR 42.1503(d). And the Federal Circuit has required this level of review—a level above the contracting officer— for CPAR evaluations. *See Bannum*, 404 F.3d at 1352. This level of review is designed to compensate for errors or bias in the contracting officer's performance evaluation. Hence, the

second-level review is required to be conducted by someone with authority over the contracting officer.

106.     As explained above in Section I, the Reviewing Official for the 2020 CPAR is Ms. Bryant. The problem is that Ms. Bryant was the formal contracting officer for the Contract at the time of the 2020 CPAR. Ms. Bryant is therefore ineligible to serve as the Reviewing Official for the 2020 CPAR, because by definition she is not someone with authority over the contracting officer, since she herself acted as the contracting officer for the Contract during the time period of the 2020 CPAR.

107.     The purpose of the review at a level above the contracting officer is "to consider disagreements between the parties regarding the evaluation." FAR 42.1503(d). Ms. Bryant's involvement as the Reviewing Official for the 2020 CPAR represents an abject failure to provide SLS with a neutral arbiter who could actually consider—objectively—disagreements between the parties and resolve them.

108.     By failing to provide a qualified Reviewing Official, USACE could not "consider disagreements" in this review as required by the law. The 2020 CPAR is therefore legally insufficient.

### 2.     The Delay In Issuing The 2020 CPAR Violates Regulation And Unfairly Prejudices SLS

109.     USACE unfairly prejudiced SLS by egregiously delaying the mandatory second-level review to which SLS was legally entitled. As explained above in Section I, the 2020 CPAR was initially issued in October 2020, and SLS submitted its comments that same month.

110.     USACE then delayed for 18 months before providing the modified 2020 CPAR on March 10, 2022, against which SLS was only then able to file this claim. The delay of 18 months

in USACE providing the legally required second level review is unsupportable and contrary to regulation and policy.

111.    USACE is required by the FAR to provide performance evaluations "as soon as practicable after completion of the evaluation." FAR 42.1503(d). Moreover, a copy of this evaluation must be "provided to the contractor as soon as it is finalized." *Id.*

112.    In addition, the government's own CPARS manual dictates that the "entire evaluation process shall be completed within 120 days following the end of the period of performance." This includes a 60-day time frame in which the Reviewing Official is to review and address any disagreements in the evaluation of a contractor.

113.    Obviously, by waiting 18 months before issuing the modified 2020 CPAR, USACE vastly exceeded the overall 120-day timeframe, and also breached the 60-day time period allotted for a Reviewing Official to actually review the contractor's comments and comment on the performance evaluation.

114.    This failure to follow established guidelines is not insignificant, and has prejudiced SLS. It raises questions regarding the validity of the modified 2020 CPAR in light of it having been issued so late.

115.    This delay has deprived SLS of the ability to timely challenge the results of the 2020 CPAR for 18 months, a time period during which SLS could have obtained fresh evidence and clear recollections from personnel most familiar with the time period under review (2019-2020).

116.    It also raises questions over the validity of the Reviewing Official's ability to address the allegations contained in the 2020 CPAR, since numerous government personnel changes under the Contract have occurred and so much time has passed. This delay in providing

constructive and timely evaluation comments has also deprived SLS of the ability to address any performance concerns raised by USACE prior to future review periods.

117.    The FAR mandates that "[p]ast performance evaluations shall be prepared at least annually and at the time the work under a contract or order is completed." FAR 42.1502(a). By delaying the Reviewing Official's review for 18 months, SLS was deprived of the opportunity to make timely performance adjustments in advance of the next evaluation cycle in 2021.

118.    By failing to adhere to the time frames mandated both by policy and regulation with respect to the Reviewing Official's review and finalization of the 2020 CPAR, USACE violated regulation and substantially prejudiced SLS. The 2020 CPAR is therefore legally invalid and should be disregarded and vacated.

### 3.    The Reviewing Official Alleges New Facts And Issues On Which SLS Has Had No Opportunity To Comment

119.    USACE's review of the 2020 CPAR deprived SLS the opportunity that they are afforded by regulation to comment on an agency's evaluation of their past performance. FAR 42.1503, the regulation which governs the contractor evaluation process, specifically provides a contractor with the opportunity to comment on an agency's evaluation of their past performance in subsection (d). The provision reads in relevant part:

> (d) Agency evaluations of contractor performance, including both negative and positive evaluations, prepared under this subpart shall be provided to the contractor as soon as practicable after completion of the evaluation. The contractor will receive a CPARS–system generated notification when an evaluation is ready for comment. Contractors shall be afforded up to 14 calendar days from the date of notification of availability of the past performance evaluation to submit comments, rebutting statements, or additional information. Agencies shall provide for review at a level above the contracting officer to consider disagreements between the parties regarding the evaluation. The ultimate conclusion on the performance evaluation is a decision of the contracting agency.

FAR 42.1503(d).

120.    This particular provision has been repeatedly held as central to the overall structure of the CPAR evaluation process as contemplated in the FAR. This is in part due to the opportunity that contractor comment creates for dialogue between the contractor and the Government, which can then go on to inform the agency's "ultimate conclusion" with respect to the contractor's past performance. FAR 42.1503(d).

121.    USACE's actions here violate FAR 42.1503(d) by failing to provide SLS with an opportunity to comment on Ms. Bryant's revised comments evaluating their past performance. It is important to note that this violation is in large part a product of the unorthodox process that the Government has followed in handling this particular CPAR.

122.    Ms. Bryant's actions did not constitute a review of the original evaluation assessment conducted by Gregory Schulz; instead, on information and belief, Ms. Bryant drafted (in name only) a modified past performance evaluation that the Government couched as a review in order for these updates to be immediately finalized.

123.    While there are obvious—and somewhat separate—procedural problems with Ms. Bryant simultaneously both modifying and "reviewing" the evaluation (discussed *supra*), the additional concern is that this modification represented another "past performance evaluation" within the meaning of FAR 42.1503(d), one which SLS is entitled by regulation to comment on.

124.    The Government's failure to allow SLS to comment is all the more troubling when comparing the original evaluation with Ms. Bryant's modified evaluation. Mr. Schulz's original evaluation was brief and bereft of documentary support for many of its conclusions—which created obvious difficulties for SLS when they crafted their original round of responsive comments.

125.     Ms. Bryant's modified evaluation however is quite the opposite—it features a variety of new factual allegations that reference specific contract documents and correspondence, thus providing SLS with adequate notice of the underlying evidence that purportedly supports the evaluation's conclusions. Unfortunately, rather than provide SLS with an opportunity to respond to Ms. Bryant's much more robust analysis in order to facilitate a dialogue between the two parties, the Government has instead chosen to limit SLS to its original substantive comments made 18 months prior on the original evaluation that failed to substantiate many of its own claims. This circumvents the structure of the CPAR process as presented in the FAR, and constitutes a "violation of applicable . . . regulation[]" sufficient to demonstrate another procedural failure of this CPAR. *Crowley Gov't Servs., Inc.*, 158 Fed. Cl. at 374.

### 4.     The Reviewing Official Did Not Write The 2020 CPAR Comments

126.     On information and belief, SLS understands that Ms. Bryant—who is listed as the Reviewing Official for the 2020 CPAR—did not actually write the comments included in the 2020 CPAR that she ultimately signed. SLS is entitled to a performance evaluation that includes "relevant information that accurately depicts the contractor's performance" and is "based on objective facts supported by program and contract or order performance data." FAR 42.1503(b)(1). USACE is required by regulation to ensure that input regarding a contractor's performance be obtained by personnel with actual knowledge of the contractor's performance on the contract. *See* FAR 42.1503(a)(1)(ii) (requiring that input for performance evaluations come from personnel involved in the contract, such as "the program office, administrative contracting office, audit office, end users of the product or service, and any other technical or business advisor").

127.     According to a discussion that Mr. Cliff Lowe, of SLS, had with Mr. Schulz (the assessing official), it is SLS's understanding that the Reviewing Official comments were written

37

by Eric Hurtado, and not Ms. Bryant. *See* Ex. 5 ¶¶ 7, 13. Mr. Schulz stated that he did not know why the 2020 CPAR was not submitted in a timely manner. *Id.* ¶ 17.

128.    He also stated that Mr. Hurtado was replaced by Ms. Bryant as the Reviewing Official, and that Ms. Bryant submitted the CPARS "in response to pressure from USACE leadership to clean up administrative issues to include delinquent CPAR evaluations." *Id.* ¶ 18; *see also id.* ¶¶ 15, 16.

129.    Needless to say, if SLS's understanding is true and Ms. Bryant in fact submitted comments to the 2020 CPAR as the Reviewing Official that she herself did not write and had no basis at the time of submission on which to make those comments, then the 2020 CPAR is invalid. This would mean that SLS did not receive the review of its 2020 CPAR to which it is legally entitled, and that USACE is attempting to disguise who in fact wrote and served as the Reviewing Official for the 2020 CPAR.

130.    At a minimum, this would make the 2020 CPAR invalid. Moreover, if someone else wrote the Reviewing Official's comments for the 2020 CPAR, that person should be identified as the Reviewing Official, and it is problematic and telling that USACE has apparently decided to hide the identity of the actual Reviewing Official for the 2020 CPAR.

### B.    The 2020 CPAR Fails to Comply with Governing Law

131.    In addition to the fatal problems with the 2020 CPAR regarding the personnel assigned to review the 2020 CPAR and the impermissible delay of 18 months that it took the Reviewing Official to actually review SLS's objections to the 2020 CPAR, as described above, the substance in the 2020 CPAR also fails to meet the minimum requirements for performance reviews as mandated by FAR 42.1503.

132.    Thus, even if the 2020 CPAR had been assigned to the correct personnel and adhered to the required deadlines following USACE procedures (neither of which happened), the 2020 CPAR would still violate the law for the reasons described below.

**1.      USACE Failed To Assess SLS's Technical Performance Regarding Its Construction Of The Border Wall**

133.    The 2020 CPAR omits the most fundamental requirement of a performance review—assessing the actual performance of the contractor in accomplishing the purpose of the Contract. USACE is required by the FAR to make an assessment of several mandatory factors in evaluating performance, including "Technical (quality of product or service)." FAR 42.1503(b)(2)(i).

134.    This requirement exists so that government agencies provide information on "the principal purpose of the contract or order" and "how the contractor performed" in meeting the principal purpose of the contract. FAR 42.1503(b)(1). Accordingly, the performance evaluation is to "accurately depict[] the contractor's performance" with respect to what the contractor was supposed to accomplish under the Contract. *Id.*

135.    However, there is no assessment of SLS's progress in constructing the border wall in the 2020 CPAR.

136.    This is a surprising omission given how clear the Contract is regarding USACE's primary goal in this effort. The Contract's primary purpose, as stated in the 2020 CPAR itself, is "for the design and construction of a reinforced, concrete retaining wall with 18 foot tall bollards on the levee that is part of the International Boundary Water Commissions (IBWC) Rio Grande Valley Flood Risk Management System."

137.    The 2020 CPAR further states that "[t]he Contractor shall provide all labor, material, supplies, tools, equipment, transportation, quality control, project management and

related services to complete the contract as specified in the Government's plans and specifications for this project and also in accordance with the Contractor's accepted design and technical approach." And the omission is more glaring given that, by September 2020, SLS had constructed .95 miles of reinforced concrete retaining walls with 18 foot tall bollards on the levee required by the Contract. Indeed, as the 2020 CPAR noted itself, the Contract was 39% complete as of the date of the 2020 CPAR. USACE had more than enough evidence of SLS's performance in constructing the border wall to make a technical assessment.

138.    Given this progress, it is remarkable that the 2020 CPAR is silent on SLS's progress in accomplishing the primary purpose of the Contract. It does not contain any discussion of the quality of the work that SLS had performed up until that point—indeed, there is no discussion of whether the bollard fence or any feature of work meet contractual requirements (they do), the quality of SLS's workmanship on these efforts, nor SLS's ability to deliver completed work in a timely manner.

139.    Rather than address these topics as the FAR requires, USACE instead only focuses on purported issues with SLS's "Quality Control System." Indeed, the only issue discussed in the entire "Quality" section of the 2020 CPAR relates only to one purported issue with quality control—the fill material required for a retaining wall—and the 2020 CPAR is clear that this issue has since been resolved with SLS providing fill material based on the government's demands (which SLS disputes was a contract requirement in the first place).

140.    But quality control is not the same as assessing the quality of SLS's work product and SLS's achievement of delivering a border wall system to USACE pursuant to the specifications in the Contract. And there is absolutely no discussion of SLS's progress in meeting this primary goal in the 2020 CPAR.

141.    The failure to address the quality of the work on the border wall system appears to be an anomaly that SLS has only experienced with the 2020 CPAR. In other performance evaluations that SLS has received for similar border wall contracts, USACE has always expressly addressed the quality of SLS's workmanship.

142.    For example, the performance evaluation for the Imperial Beach Contract in late 2019 addressed the quality of SLS's construction in great detail. It stated that "Overall the Contractor delivered a Very Good quality project" and that "[a]ll features of the work were constructed per design and with good quality over the span of 14 miles with few deficiencies." For the RGV-02 and RGV-03 Contracts, USACE specifically stated that the quality of SLS's work was acceptable.

143.    Because the FAR mandates that a performance evaluation actually assess the contractor's ability to meet a contract's "technical" requirements, the 2020 CPAR is legally deficient and must be vacated. The FAR requires that USACE assess SLS's quality of workmanship in constructing the border wall system, and USACE has not provided such an assessment in the 2020 CPAR.

### 2.    USACE's Ratings In The 2020 CPAR Do Not Comply With Mandatory Definitions In The FAR

#### a.    Inappropriate Marginal Rating

144.    USACE gave SLS a rating of "Marginal" for the "Quality" category in the 2020 CPAR. But the narrative included in the 2020 CPAR demonstrates that USACE did not apply the required definition of "Marginal" as mandated by the FAR.

145.    The FAR defines the Marginal rating as performance where the contractor "has not yet identified corrective actions" or the "proposed actions appear only marginally effective or were not fully implemented." FAR 42.1503 Table 42-1(d). And the government is required to "identify

a significant event in each category that the contractor had trouble overcoming and state how it impacted the Government." *Id.*

146.    Thus, as a matter of law, USACE may rate SLS's performance as marginal only if the government identifies a significant event that SLS failed to overcome because SLS failed to identify corrective actions or the proposed actions were not effective, which is not the case here.

147.    The government identifies backfilling issues stemming from SLS's quality control program, while confirming in the same paragraph that SLS "ultimately replaced the Contractor Quality Control System Manager and conditions are improving." By definition SLS proposed a corrective action to the problem the government identified and SLS's solution cannot be described as "only marginally effective" when the government admits that "conditions are improving." *Id.* Instead, the 2020 CPAR demonstrates, on its face, that SLS deserved a higher rating than Marginal based on the mandatory definition of that term that USACE should have used when assessing SLS in the 2020 CPAR.

148.    Moreover, the FAR makes clear that a "Marginal" rating may not be used if the contractor's performance meets the minimal contractual requirements: "A fundamental principle of assigning ratings is that contractors will not be evaluated with a rating lower than Satisfactory solely for not performing beyond the requirements of the contract/order." FAR 42.1503 Table 42-1(c).

149.    As explained above, the 2020 CPAR does not address the fact that SLS is, fundamentally, achieving the primary objective of the Contract: construction of the border wall system. The issues raised in the 2020 CPAR are minor in comparison to the complexity and scope of the contract, and SLS's superior quality of construction meets the primary objectives of the Contract.

150.    The issues cited by USACE—particularly in the face of corrective action by SLS—simply do not provide a basis for a Marginal rating. USACE is prohibited by the FAR from downgrading SLS to this rating in every single evaluation category when SLS is meeting the construction requirements of the Contract.

**b.**    Inappropriate Unsatisfactory Ratings

151.    USACE gave SLS a rating of "Unsatisfactory" for the "Schedule," "Management," and "Small Business Subcontracting" categories in the 2020 CPAR. But, again, the narratives included in the 2020 CPAR for these categories demonstrates that USACE did not apply the required definition of "Unsatisfactory" as mandated by the FAR.

152.    The FAR defines the Unsatisfactory rating to mean that the contractor's "[p]erformance does not meet most contractual requirements" and "[t]he contractual performance of the element or sub-element contains a serious problem(s) for which the contractor's corrective actions appear or were ineffective." FAR 42.1503 Table 42-1(e).

153.    The government is required to "identify multiple significant events" in a given review category or a singular problem "of such serious magnitude that it alone constitutes an unsatisfactory rating." Thus, as a matter of law, USACE may rate SLS's performance as unsatisfactory only if SLS's performance on identifiable elements or sub-elements of work contained either "multiple significant events" or a singular problem of serious magnitude and SLS's proposed corrective actions "were ineffective." *Id.*

154.    Indeed, the 2020 CPAR itself notes in the following areas that, of the minor issues identified, SLS has instituted corrective actions and that the issues identified have been or are being resolved:

   a.    **Schedule**: USACE's entire basis for its Unsatisfactory rating is SLS's failure to maintain the Contract schedule. However, as more fully described below in Section

43

III.C.1, USACE's description of SLS's performance is not accurate. And by definition, its description in the 2020 CPAR fails because SLS proposed corrective actions that were not "ineffective." FAR 42.1503 Table 42-1. First, USACE notes that SLS took corrective action to improve the schedule performance and "some improvements have been evident in the last 60-90 calendar days." And these improvements to schedule performance were clearly effective because, as of today, SLS has completed 5.41 miles of the bollard barrier that the Contract required, meaning that SLS has finished 69% of the original Contract's objectives. *See* Ex. 5 ¶ 4. And as a result of broader national policies, USACE exercised a partial termination for convenience of the Contract such that SLS's finished work now represents a 99% completion rate for the altered Contract objectives. *See id.* Second, SLS also submitted re-baselined schedules multiple times throughout 2020 to update the period of performance end date to reflect USACE real estate acquisition delays. However, USACE refused to accept these updated schedules based on flawed assessments that the proposed schedules were noncompliant. SLS proposed two corrective actions and executed on ramping up its production efforts and these actions were clearly effective. As a result, the 2020 CPAR is by definition insufficient to justify an Unsatisfactory rating on this category.

b. **Management**: USACE bases its Unsatisfactory rating on two issues: Quality and Schedule performance. On Quality, SLS proposed and took corrective actions that USACE admitted led to conditions improving. By definition SLS's performance on Quality merits a higher rating than Unsatisfactory. And on Schedule, for the reasons discussed above, SLS's performance merited a higher than Unsatisfactory rating.

Given that the government failed to identify sufficiently serious events and SLS's proposed corrective actions were effective for both Quality and Schedule, the 2020 CPAR is by definition insufficient to justify an Unsatisfactory rating on this category.

c. **Small Business Subcontracting**: As discussed more fully in Section III.C.3 below, SLS relied upon the verbal confirmation of a subcontractor's small business size status. Of import here is the fact that the 2020 CPAR does not include either multiple significant events or a single event of sufficiently serious magnitude to justify the rating. The 2020 CPAR includes two events: SLS's failure to timely submit its Subcontracting Report for Individual Contracts ("ISR Reports") and SLS's failure to meet its lofty small business subcontracting goals. The first is an administrative timing issue and cannot be considered to be significant. And moreover, SLS proposed and executed a corrective action: SLS submitted the ISR Reports within a few days of the government's notification. On the second, this issue is neither significant for multiple events nor sufficiently serious on its own to justify an Unsatisfactory rating because SLS still greatly exceeded the government's small business subcontracting goals in the RFP. The RFP established the government's goal of 25% small business subcontracting and SLS far exceeded this goal by achieving over 60% small business participation during the performance period, despite failing to meet its errantly higher goal of 83%. Neither event is sufficient (together or separately) to justify an Unsatisfactory rating. Although the government has indicated a willingness to reconsider the Small

Business Subcontracting rating, the government's refusal to vacate the erroneous rating while it considers this issue continues to cause SLS harm.

### 3. USACE Failed To Reference The Management Tool Notifying SLS Of A Contract Deficiency, Which Is Required For A Marginal Rating

155. The FAR explains that agencies must take extra care when rating any contractor below Satisfactory in any category. In particular, the FAR requires that agencies to support a Marginal or Unsatisfactory rating "by referencing the management tool that notified the contractor of the contractual deficiency (e.g., management, quality, safety, or environmental deficiency report or letter)." FAR 42.1503 Table 42-1(d). USACE made no such reference to a management tool that notified SLS of a contractual deficiency in the 2020 CPAR.

156. For example, USACE writes in the "Schedule" category about how SLS failed to submit a "contract compliant re-baseline schedule . . . [d]espite multiple requests from the government for a re-baselined schedule." However, USACE does not indicate or reference the management tool that USACE used to notify SLS of this purported contractual deficiency. USACE's failure to reference a deficiency report or letter raising these issues in a timely manner highlights that there were fundamental flaws in USACE's rating process in the 2020 CPAR.

### 4. USACE Failed To Support The 2020 CPAR With Quantifiable Or Verifiable Documentation

157. These assessments are not based on objective facts nor are they supported by program and contract data as expressly required by the FAR. *See* FAR 42.1503(b)(1).

158. The 2020 CPAR is further deficient because USACE failed to provide quantifiable and verifiable documentation that would support its claims in the performance review. Indeed, there is not a single performance assessment document nor official government communication referenced in the entire 2020 CPAR.

159.    This omission is in direct violation of what USACE is required to provide in its performance reviews. The FAR requires that the information included in the performance review be "based on objective facts supported by program and contract or order performance data." FAR 42.1503(b)(1).

160.    Even more specifically, USACE is required by Army regulation to support any narrative in a performance review with "quantifiable or verifiable documentation." AFARS § 5142.1503(b)(4). Larger and more complex efforts, such as this one, "warrant greater detail," and providing additional detail is particularly important. *Id.*

161.    The 2020 CPAR fails entirely to provide quantifiable or verifiable documentation, and thus violates the law as described above. There are no performance assessment documents referenced or cited in the 2020 CPAR, and the only specific document even referenced is SLS submitted Subcontracting Reports for Individual Contracts.

162.    Instead, the 2020 CPAR is laced with opinions and assessments that include some purported facts but that all fail to include any verifiable documentation. The performance evaluation process is not the place for USACE to levy unsupported grievances at SLS—the FAR requires that the evaluation be "based on objective facts" and the AFARS requires "quantifiable or verifiable documentation." Having failed to provide these basic elements of a performance review, the 2020 CPAR does not comply with binding regulations.

163.    Any one of the aforementioned legal violations in the substance of the 2020 CPAR are sufficient on their own to warrant a new performance evaluation from appropriate USACE personnel. Taken together, however, these issues represent a series of violations that seriously undermine confidence in USACE's ability to conduct the performance review process in accordance with the law.

164.    The entire process leading to the 2020 CPAR is suspect because of these and other clear violations of the law. SLS respectfully submits that USACE must conduct a review of the actions leading to this fundamentally flawed 2020 CPAR to learn why SLS did not receive a performance evaluation that meets legal requirements.

C.      **USACE Arbitrarily And Capriciously Evaluated SLS's Performance**

165.    For the reasons discussed above, USACE's 2020 evaluation of SLS's performance is fundamentally flawed because USACE did not assign appropriate personnel to assess SLS's performance and failed to comply with the law in the substance of the 2020 CPAR. In addition to these fatal errors, it is clear that USACE acted arbitrarily and capriciously in evaluating SLS in the 2020 CPAR.

166.    As explained below, USACE's evaluation is arbitrary and capricious because it does not accurately reflect SLS's performance and it criticizes SLS for issues wholly unrelated to the requirements in the Contract. Accordingly, the 2020 CPAR should be vacated and USACE must conduct a new performance evaluation.

1.      **USACE Failed To Accurately Depict SLS's Performance**

167.    The 2020 CPAR failed to accurately depict SLS's performance. The FAR is clear that in assessing contractor performance, reviewing agencies must base conclusions on "relevant information that accurately depicts the contractor's performance" and is supported by "performance data." FAR 42.1503(b)(1). Additionally, the FAR instructs that CPAR evaluations "be tailored to the contract type, size, content, and complexity of the contractual requirements." *Id.*

168.    The Armed Services Board of Contract Appeals summarizes the requirement as follows: "[i]n completing a[] [CPARS] assessment, the government must provide a contractor with a fair and accurate performance evaluation." *PROTEC GmbH*, ASBCA No. 61161, 19-1 BCA ¶

37,362 (citing *Colonna's Shipyard, Inc.*, ASBCA No. 56940, 10-2 BCA ¶ 34,494 at 170,140; *Versar, Inc.*, 10-1 BCA ¶ 34,437 at 169,959).

169.    USACE failed to comply with this requirement as its review did not accurately depict SLS's performance on three separate substantive issues. First, the 2020 CPAR downgrades SLS on the "Schedule" and "Management" factors because SLS failed to achieve the "production rate contained in the accepted contractor's initial construction schedule" for the erection of 60 wall panels over 485 feet. However, as an initial matter, the only required performance milestone in the Contract was for SLS to complete the overall scope of work by the project end date. The "production rate" that USACE is downgrading SLS for failing to meet is SLS's proposed production rate from the original project schedule. But this production rate was created by SLS before it was revealed that there would be a number of real estate delays on the project caused by USACE, and that the piecemeal methodology, sequence, and timing of releasing real estate would all occur differently than contemplated in the baseline project schedule (i.e. the accepted contractor's initial construction schedule). It is arbitrary and capricious for USACE to hold SLS to a production rate that was rendered obsolete by USACE's fundamental alteration of the structure and timing of construction as contemplated in the original Contract.

170.    The delay associated with this Contract was squarely due to the Government's failure to timely release the necessary real estate on which the wall was to be constructed. The Contract originally called for construction to begin in April 2019, but the government did not issue a construction Notice to Proceed until August 2019, and that was only a limited notice to proceed for a small portion of the larger section of land. Moreover, all necessary real estate required for that section was not fully released until February 2020, ten months after the initial NTP release date specified in the contract.

171.    The 2020 CPAR improperly fails to recognize the difficulty in securing labor and materials on an indeterminate timetable during a pandemic, and ignores the Suspension of Work letter issued on April 20, 2019, which prohibited SLS from purchasing "long lead" materials without the Administrative Contracting Officer's approval 30 days prior to the "order date" of the materials, which could never be established because of the government's real estate delays.

172.    This, combined with the government's refusal to provide an accurate timetable for the release of real estate, significantly impeded SLS's ability to mobilize quickly once real estate was released. In fact, on information and belief, USACE told SLS and the other contractors for months that the necessary real estate would be released soon, i.e., within a few weeks; however, USACE refused to provide any more details and would consistently blow through any reasonable interpretation of "soon." SLS could not fully mobilize its project sites based entirely on USACE's continued statements that the real estate release was just around the corner. It is therefore unfair and unreasonable for the government to criticize SLS for failing to meet a production rate that was based on the Contract's original timetable, which did not account for government-caused delays.

173.    Second, the 2020 CPAR improperly downgrades SLS on the "Quality" and "Management" factors in relation to delay and complications in constructing a "levee" wall. While the original solicitation for the contract called for the construction of a "levee wall," Amendment 0002 to the solicitation deleted the reference to "levee wall," and replaced that term with a "retaining wall." In accordance with the contract terms, SLS constructed a "retaining wall" to required specifications.

174.    The government constructively changed the contract by then requiring a "levee wall" instead of a "retaining wall," which necessitated changes to SLS's construction methods that extended the duration of performance.

175.    The downgrading of SLS for failing to timely construct a levee wall (a term that the government tellingly uses in the CPAR itself) not required by the contract is meritless.

### 2.    Inconsistent Treatment of SLS's Substantive Performance

176.    Along with the clear substantive errors described above, USACE is further compounding errors by inconsistently describing and assessing these substantive issues. As described above in Section I.B.2, the RGV-03 2020 CPAR (another border barrier CPAR) addresses nearly identical requirements and challenges, yet SLS received positive ratings for its work on that contract.

177.    Most troubling, the real estate issues that plagued the government's efforts in RGV-02 (for which the government is seeking to blame SLS) are addressed in the RGV-03 2020 CPAR and explained as obvious government failings for which SLS cannot be held accountable. *Id.* at 3. That CPAR recognizes that "the Government did not . . . execute modifications in time to allow the contractor to mobilize" once real estate was released, and that "the contractor could not be expected to provide a reasonable schedule based upon [] largely unknown real estate concerns."

178.    It is deeply troubling to SLS that the government's own problems with executing the border barrier mission would be used to criticize SLS—particularly in situations where the government separately admits (under identical facts) that the government is to blame for schedule delays and other problems. This concern is further heightened where SLS received almost all "Satisfactory" or "Very Good" ratings for the previous period of review on RGV-02.

### 3.    SLS is Effectively Being Punished for Exceeding Small Business Subcontracting Requirements in Prior Proposals

179.    With respect to the "Unsatisfactory" rating that SLS received for "Small Business," it is important to note that this rating does not reflect any deficiency or regulatory violation on the

part of SLS. Rather, the rating reflects that SLS was not able to achieve the (non-binding) goals it provided in its small business subcontracting plan.

180.    Notably, SLS has never been adjudged to have failed to provide a "good faith effort to comply with a subcontracting plan," as required by FAR 19.705-7(a). Rather, the "Unsatisfactory" rating is based on two issues that do not demonstrate SLS's failure to make a good faith effort to comply. First, SLS submitted Individual Subcontracting Reports late, which SLS immediately corrected. This is a minor administrative issue that should not provide substantial support to an "Unsatisfactory" rating.

181.    Second, and the predominant reason for the "Unsatisfactory" ratings, is that SLS set admirably high goals in its small business subcontracting plan for the RGV-02 contract, greatly exceeding the solicitation's goal. However, SLS only believed that it would be able to achieve these high goals due to an honest mistake. SLS accepted a verbal confirmation that a critical subcontractor, a local family-owned business with only two offices, was a small business and failed to verify the claim through SAM. As a result, SLS mistakenly submitted a Small Business Subcontracting Plan that reflected a small business subcontracting goal of 83%, far exceeding the solicitation's goal of only 25%. SLS later determined that due to annual revenues, the subcontractor was in fact a large business.

182.    Upon realizing this mistake, SLS sought relief from the Contracting Officer to reduce the small business participation rate within the Small Business Plan to align with the solicitation requirements. SLS correctly pointed out that the Solicitation did not provide any special considerations for Small Business Plans that exceeded solicitation goals. The Solicitation rated Small Business Plans as simply "Acceptable," if the 25% goal was met or exceeded, or

"Unacceptable" if the goal was not met. SLS's Small Business Subcontracting Plan showing an 83% goal did not factor into the government's award determination.

183.   Despite this fact, the Contracting Officer refused to provide SLS the requested relief, and SLS's Small Business Plan was submitted to the SBA. Because of the extremely high small business subcontracting goal in the plan (83%) it was practically impossible for SLS to recover, since the subcontractor in question was a key team member in the proposal and is also under contract to perform a significant portion of the work, making it virtually impossible to replace them.

184.   And while Contracting Officer agreed to reevaluate the Small Business Subcontracting rating in the challenged COFD, the Contracting Officer refused to vacate this rating during this reassessment, meaning that the "Unsatisfactory" rating remains, continuing to cause harm to SLS's reputation even while the agency reassesses the issue. *See* Ex. 1 at 6-7.

### D.   The Contracting Officer's Final Decision Summarily Fails to Justify Denial of SLS's Claim

185.   As referenced above, the Contracting Officer issued the COFD on February 16, 2023, denying SLS's Claim. However, this paltry, eight-page document is legally and substantively flawed, contains only one page of a discussion of the Contracting Officer's decision, and does not provide anywhere near adequate justification for denying SLS's Claim.

186.   As an initial matter, the COFD was issued *121 days* after the original due date for issuing the COFD pursuant to the Contract Disputes Act. SLS submitted the COFD on August 19, 2022. Therefore, the COFD was required by the Contract Disputes Act and the FAR to be completed by October 18, 2022. Instead, the Contracting Officer confirmed on October 18 in correspondence with SLS that she was still reviewing and researching the Claim; she gave no indication as to when she would issue the COFD.

187.    After providing SLS with no updates for *over four months*, the Contracting Officer finally issued her decision on February 16, 2023. This length of delay is in direct contravention of both the Contract Disputes Act and the FAR and represents a separate violation of SLS's rights.

188.    Putting aside the illegal delay, the Contracting Officer's COFD is premised on false findings of fact that are either flat-out wrong or misleading as to what the governing rules actually are for this type of claim.

189.    The Contracting Officer states that the 2020 CPAR was not procedurally inadequate because a Department of the Army U.S. Army Corps of Engineers Engineering Regulation states that the Procuring Contracting Officer shall act as the Reviewing Official for interim and final unsatisfactory performance evaluations. Ex. 1 at 3, 6-7.

190.    But while styled as "regulations," the provisions on which the COFD relies are internal policies, and thus cannot contradict the FAR or the Federal Circuit's decision in *Bannum*, which clearly provides that that review be had "at a level above the contracting officer." FAR 42.1503(d). The FAR provides a specific process that agencies must follow in order to issue supplemental policies or regulations that deviate from the FAR, and this USACE policy has not complied with that process. *See* FAR 1.304(b) (agency acquisition regulations should not conflict with the FAR except as required by law or provided in FAR subpart 1.4); FAR 1.501-1, 1.501-2 ("significant revisions" that "alter the substantive meaning of any coverage in the FAR System and . . . have a significant cost or administrative impact on contractors or offerors" must go through notice and comment). Thus, the internal policy on which the agency relies cannot overcome the clear command in the FAR.

191.    Further, USACE Acquisition Instructions make clear that a "Procuring Contracting Officer" is a contracting officer. *See* USACE Acquisition Instruction, Part 2 § 2.101-100 (2013)

("'Contracting Officer' within the UAI means the Procuring Contracting Officer (PCO)").[2] Ms. Amelia Bryant was serving as the contracting officer for the RGV-02 contract at the time she finalized the 2020 CPAR and acted as the Reviewing Official, as confirmed by the letter notifying SLS of her appointment. Thus, as the contracting officer for the RGV-02 contract, Ms. Bryant was not eligible to serve as the Reviewing Official on the CPAR for this project, because she was not "at a level above the contracting officer." FAR 42.1503(d). The purpose of the second-level review requirement—to prevent bias or mistake by a contracting officer—is not satisfied by Ms. Bryant's review of the evaluation.

192.    Accordingly, the COFD is flatly incorrect in asserting that the "Reviewing Official was legally qualified to address the disagreements that were raised during the CPARS process." Ex. 1 at 7.

193.    The Contracting Officer next incorrectly claims that the Reviewing Official's belated supplemental comments did not "introduce new facts, but instead provide specific and sufficient details that address SLSCO's arguments for the specific rating period and show that the ratings given by the ACO in the initial evaluation for Quality, Schedule, and Management, are supported." *Id.* at 4.

194.    In truth, the Contracting Officer's comments introduced a multitude of new facts that reference specific contract documents and correspondence, which were not included or referenced in the original 2020 CPAR.

195.    For example, in the Revised Comments regarding the Quality factor, the Contracting Officer, Ms. Bryant, references several new pieces of correspondence between

---

[2]  Available   at   https://www.usace.army.mil/Portals/2/docs/Contracting/USACE_Acquisition_Instruction_HCA_18MAR13.pdf.

USACE and SLS that were not originally discussed in the Assessing Official Comments. The Contracting Officer references Serial Letters C-0031 and H-0011 for the first time to support upholding the Assessing Official's rating. Even worse, she references a serial letter (C-0021) that is dated September 23, 2019, and that even the Contracting Officer admits "falls outside the rating period." Including new facts in her Reviewing Official Comments is bad enough, but including new facts that lie outside of the review period is indefensible.

196.    Another glaring addition of new facts is in the Revised Comments for the Management Factor. Instead of commenting on the Assessing Official Comments as drafted, the Reviewing Official added in an entirely new discussion about the QA Reports on the RGV-02 Contract. She cited to QA Reports from at least three different months to support her conclusion that the Assessing Official's comments on this factor were correct.

197.    This sort of additional fact finding goes well beyond the Reviewing Official's role to review the assessing official's evaluation and instead constitutes a modified evaluation, on which SLS is at least entitled to submit comments and objections. By including these new facts and turning the Assessing Official Comments into a modified evaluation, SLS was denied any opportunity to comment on or dispute these new facts. Denying SLS the ability to refute the comments in the CPAR is antithetical to the entire CPARS process and a violation of the FAR.

198.    These examples of additional facts included by the Reviewing Official into the 2020 CPAR entirely refute the Contracting Officer's claim in the COFD that the Reviewing Official did "not introduce new facts." These are not "specific and sufficient details that address SLSCO's arguments" as the COFD suggests, they are new facts that the initial 2020 CPAR did not include until 18 months later when finally addressed by the Reviewing Official.

199.    The Contracting Officer also incorrectly rebukes SLS's justified inclusion of the intimately related facts for the RGV-03 contract, which involved the same scope of work, the same assessing official, and the same Reviewing Official, and the same underlying issues, yet resulted in fundamentally different rating results. Given that the RGV-02 and RGV-03 project sites are *adjacent to each other* and were subject to the same real estate delay issues, it is disingenuous to claim that RGV-03 is simply "another contract" that has no bearing on this review. The COFD entirely fails to address or explain the vast disconnect between the review for RGV-02 and RGV-03, summarily dismissing it and ignoring many of the points raised in SLS's Claim.

200.    The COFD also fails to engage entirely with the detailed issues regarding the substance of the 2020 CPAR, which SLS raised in its Claim. SLS's Claim raised material issues with respect to the individual ratings in the 2020 CPAR based on SLS's performance of the RGV-02 Contract, including:

   a.   USACE failed to acquire critical real estate necessary for performance of the RGV-02 Contract, which substantially delayed the contract schedule, and therefore criticisms of SLS's adherence to the contract schedule are misplaced and fail to account for USACE's fault in delaying performance. *See* Ex. 2 at 10-11, 24-25.

   b.   USACE failed to account for the distinction between a "retaining wall" and a "levee wall" in the contract terms, and held SLS to a standard of performance not found in the RGV-02 Contract. *See id.* at 11-12, 24-25.

   c.   USACE failed to actually assess SLS's technical performance regarding its construction of the border wall system. *See id.* at 19-20.

d.      USACE failed to apply CPAR ratings that comply with the mandatory definitions in the FAR. *See id.* at 20-22.

e.      USACE failed to reference the management tool notifying SLS of a contract deficiency, which is a requirement for certain ratings. *See id.* at 23.

f.      USACE failed to support the 2020 CPAR with quantifiable or verifiable documentation. *See id.* at 23-24.

201.    Rather than address these issues, the COFD summarily declares that a "reassessment of SLSCO's performance during the rating period will not be conducted since a reassessment would not change the ratings or the narratives that were provided to SLSCO." Ex. 1 at 7. There is no indication that these issues were even considered by the Contracting Officer in issuing the COFD.

202.    There is also no indication that the Contracting Officer considered any of the government-caused delays in releasing real estate, which upended the agreed-upon construction schedule and upended SLS's ability to commit and scale-up resources for this project in a timely way. The Contracting Officer's failure to consider the significant ramifications of the government's actions represents yet another fundamental flaw of the COFD.

203.    Perhaps most gallingly, the Contracting Officer provides no explanation or justification for the *18-month delay* between SLS responding to the ratings on October 10, 2020, and the RO finalizing the CPAR on March 10, 2022.

204.    The Contracting Officer contends that the 18-month delay did not pose an issue because "SLSCO was provided the opportunity to challenge the AO evaluation as part of the CPARS process in a timely manner." *Id.* at 4. SLS having an opportunity to originally comment on the CPAR does not cure the unjustified delay and breach of applicable law.

205.    The Contracting Officer has confirmed that a reassessment of SLS's performance during the CPAR rating period would not change the ratings or the narratives and therefore SLS's ratings for Quality, Management and Schedule will not be vacated. *See* Ex. 4, Declaration of William Sullivan ¶ 6, 8. Additionally, the Contracting Officer has indicated the COFD itself will not be rescinded, despite its failure to address the arguments detailed above. *Id.*

206.    In order to reassess the Small Business Utilization rating—the one aspect of SLS's claim that the COFD stated "had merit"—the Contracting Officer has indicated that CPAR must be changed to "Drafted" status in order for the Contracting Officer to reassess even one factor. *Id.* ¶ 5.

207.    And with respect to the Small Business Utilization rating, the Contracting Officer simply found that the "RO provided no review comments and does not address the Contractor's comments in CPARS for this factor." The Contracting Officer has yet to identify any specific issues with the substance of the assessment, and it remains to be seen what relief—if any—she will provide SLS in connection with this rating.

208.    Based on this flawed and deficient assessment and to address the inequity of permitting these ratings to stand, SLS is filing this appeal.

### COUNT I

### USACE'S EVALUATION OF SLS'S PERFORMANCE IN THE 2020 CPAR IS UNREASONABLE, UNFAIR, INACCURATE, ARBITRARY, CAPRICIOUS, UNLAWFUL, AND AN ABUSE OF DISCRETION

209.    SLS incorporates by reference paragraphs 1-208 of the Complaint as if fully set forth herein.

210.    USACE's assessment of SLS in the 2020 CPAR was unreasonable, unfair, inaccurate, arbitrary, capricious, inconsistent with FAR 42.15, inconsistent with formal DoD guidance, and an abuse of the Contracting Officer's discretion under the Contract.

211.    The CPAR is a performance assessment which USACE issued pursuant to the Contract and FAR 42.15. As such, SLS is entitled to assert the protections of contractors embodied in FAR 42.15. Among those protections is the assurance that any performance assessment conducted by the government be fair and accurate. Moreover, the assessment must include clear relevant information that accurately depicts the contractor's performance and "be based on objective facts supported by program and contract or order performance data." FAR 42.1503(b)(1). Notwithstanding that a contracting officer is accorded discretion in preparing a performance assessment under FAR 42.15, it is an abuse of a contracting officer's discretion to issue a performance assessment under FAR 42.15 that is unfair or inaccurate.

212.    Accordingly, SLS is entitled to a declaratory judgment declaring that the CPAR and its three component ratings not subject to reassessment—Quality, Schedule, and Management—are unreasonable, unfair, inaccurate, arbitrary, capricious, inconsistent with FAR 42.15, inconsistent with formal DoD Guidance, and an abuse of the Contracting Officer's discretion under the Contract.

213.    As part of the declaratory judgment requested herein, SLS is also entitled to an order remanding the CPAR to USACE with proper and just instructions to reexamine the ratings in the CPAR and either build a proper record for the ratings, or otherwise assign ratings and adjust the corresponding narrative as necessary to comport with the record that is available.

## COUNT II

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

214.    SLS incorporates by reference paragraphs 1-213 of the Complaint as if fully set forth herein.

215.    USACE breached the covenant of good faith and fair dealing by issuing a procedurally and substantively deficient CPAR that USACE knew failed to meet the requirements of the FAR and DoD Guidance.

216.    Based on the FAR and the Contract, SLS justifiably expected USACE to assign personnel with knowledge of SLS's performance to review SLS, assign a qualified second level reviewer at a level above the contracting officer to make a good faith assessment of the disagreements between the parties, and make a good faith effort to accurately apply the CPAR performance standards as outlined in the FAR in a timely manner. USACE failed to do so, depriving SLS of the benefits of its bargain under the Contract, in violation of the implied covenant of good faith and fair dealing.

## COUNT III

## BREACH OF THE IMPLIED DUTY TO COOPERATE

217.    SLS incorporates by reference paragraphs 1 – 216 of the Complaint as if fully set forth herein.

218.    USACE had an obligation to cooperate with SLS in a timely manner by providing SLS with information that could remedy USACE's perceived deficiencies with SLS's contract performance. *See Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 770 (2005) ("Breaches of the implied duty to cooperate have been found when a contracting officer responded to a contractor's requests in an evasive or untimely manner.").

219.    Instead, USACE failed to identify or communicate these alleged deficiencies to SLS.

220.    As a result, SLS was unable to address or alleviate the Agency's concerns until after the Contract was partially terminated. This has resulted in substantial long-term damage to SLS's ability to procure additional work on behalf of the federal government.

221.    This injury has been further compounded by USACE's failure to timely resolve SLS's CDA claim, and underscores USACE's breach of the implied duty. *See D'Andrea Brothers LLC v. United States,* 109 Fed. Cl. 243, 255-56 (2013) ("The implied covenant is breached when the government unreasonably fails to cooperate in the other party's performance, . . . or commits actions that unreasonably cause delay or hindrance to contract performance.") (internal citations and quotations omitted).

## **PRAYER FOR RELIEF**

WHEREFORE, SLS requests that the Court enter judgment in its favor and against the United States and further requests that the Court:

1.  Declare that the 2020 CPAR and the component performance ratings not subject to reassessment are unreasonable, unfair, inaccurate, arbitrary, capricious, inconsistent with FAR 42.15, inconsistent with formal DoD guidance, and an abuse of the Contracting Officer's discretion under the Contract;

2.  Require USACE to comply with the law by vacating the 2020 CPAR with respect to all ratings;

3.  Remand the matter to USACE with proper and just instructions to reexamine the ratings in the CPAR and either build a proper record for the ratings, or otherwise assign ratings and adjust the corresponding narrative as necessary to comport with the record that is available;

4.  Require USACE to assign an appropriate assessing official with actual knowledge of SLS's performance and a Reviewing Official that is legally qualified to address disagreements in accordance with the FAR;

5.  Require USACE to ensure that the officials assigned to assess and review SLS's performance have not been involved in any aspect of the 2020 CPAR, SLS's claim on the CPAR, or the resulting COFD, in order to avoid any bias;

6.  Require USACE to reassess SLS's performance on the Contract in line with governing law, in a manner reflective of SLS's actual performance and in a manner more consistent with USACE's previous ratings of SLS for border wall projects;

7.  Require USACE to provide SLS the opportunity to comment on the reassessed 2020 CPAR, and that USACE actually provide the legally mandated second level review at a level higher than the contracting officer as provided for in FAR 42.1503(d); and

8.  Grant such other and further relief as this Court may deem just and proper.

Dated:  April 18, 2023                             Respectfully submitted,

                                                   /s/ Dean W. Baxtresser
*Of Counsel:*                                      Dean W. Baxtresser
                                                   Latham & Watkins LLP
Kyle R. Jefcoat                                    555 11th Street NW, Suite 1000
Genevieve Hoffman                                  Washington, DC 20004-1304
William Blake Page                                 Direct Dial:  (202) 637-2110
Walter Allen Perry                                 Dean.Baxtresser@lw.com
Latham & Watkins LLP
555 11th Street NW, Suite 1000                     *Counsel for SLSCO, Ltd.*
Washington, DC 20004-1304
Telephone: (202) 637-2200